Parker, as Commissioner of Banking, Respondent, vs. National Surety Company, imp., Appellant.

*May 3—June 20, 1927.*

*Insurance: Fidelity bonds: Against dishonest acts of bank officer: Irregular loans: Liability of insurer.*

1. In view of secs. 221.08, 221.09, and 221.15, Stats., relating to the management of banks, where bank officials either knew of the unconcealed irregularities of the bank president in overdrawing checking accounts and borrowing money from the bank on unsecured notes over a period of many years, or must be held to have had constructive knowledge, a surety company bonding him was not liable on a bond indemnifying the bank against fraud or dishonesty, regardless of the fact that such borrowing violated sec. 221.31.    pp. 341, 342.

2. The surety on the indemnity bond of the president had the right to assume that the bank would be managed and supervised in the manner provided by law. p. 342.
3. So, also, such surety had the right to assume that the practice as to overdrafts by and loans to the president, followed through a long period of time and with the knowledge and consent of the board of directors, would not be characterized as fraudulent and dishonest within the meaning of the bond. p. 342.

APPEAL from a judgment of the circuit court for Bayfield county: G. N. RISJORD, Circuit Judge. *Reversed.*

For the appellant there were briefs by *Dietrich & Dietrich* of Superior and *Courtney & Courtney* of Duluth, and oral argument by *H. A. Courtney.*

For the respondent the cause was submitted on the brief of *Walsh & Morris* of Washburn.

OWEN, J. In the month of February, 1920, the defendant surety company issued to the Northern State Bank, a banking corporation located at Washburn, in Bayfield county, its fidelity bond by which it agreed to indemnify the bank against loss not exceeding $5,000 occurring through the "fraud, dishonesty, forgery, theft, embezzement, or wrongful abstraction of Monroe Horr Sprague," president of the bank.

The bank became insolvent, and on the 5th day of December, 1923, was taken over by the commissioner of banking for the purpose of liquidation. At that time the assets of the bank included an unsecured note signed by said Sprague in the sum of $6,500. There was also an overdraft in the checking account known as "M. H. Sprague, Lathe Mill No. 2," in the sum of $4,167.57, and an overdraft in the checking account known as "M. H. Sprague, Lathe Mill No. 3," in the sum of $4,224.95. It is undisputed that these lathe-mill accounts were Sprague's accounts and grew out of separate and distinct businesses conducted by him.

This action was commenced by the commissioner of bank-

ing against the surety company to recover the amount of the fidelity bond, claiming that the bond indemnified the bank against losses arising from these transactions. The lower court so held and rendered judgment against the surety company.

Sec. 221.31, Stats., makes it a penal offense, punishable by imprisonment in the state prison not exceeding ten years, for the president of a bank, "without authority by resolution of the board of directors previously made and recorded upon its minutes and without one or more indorsers, the responsibility of whom shall have been approved by like previously recorded resolution or in lieu of such indorser or indorsers, collateral security the sufficiency of which shall have been approved by like previously recorded resolution," to directly or indirectly borrow the funds of the bank in excess of one thousand dollars.

It is undisputed that ever since Sprague became president of the bank in 1917 he was in the habit of borrowing money from the bank upon his unsecured note without authority from the board of directors, and that his various checking accounts with the bank were overdrawn during a large portion of the time. There was, however, no attempt on the part of Sprague to conceal these transactions. Whenever he borrowed money he placed his note in the bank for the amount borrowed, and the same was duly entered upon the books of the bank. The overdrafts on his checking accounts were at all times fully and honestly revealed by the books of the bank. Without doubt this practice offended against the statute above mentioned and subjected Sprague to criminal penalties, but it does not follow that these transactions gave rise to liabilities under the bond. The history of the relations existing between the bank and Sprague plainly indicates that the provisions of the statute were ignored by both Sprague and the bank, and that neither Sprague nor the bank regarded such loans and overdrafts as unfaithful or dishonest conduct on the part of Sprague. It was the purpose

of this bond to indemnify the bank against loss arising from the fraud or dishonesty of Sprague. The surety company did not undertake to guarantee the contractual indebtedness of Sprague to the bank. While these loans and overdrafts were irregular, and no doubt in a sense dishonest, they did not constitute that character of dishonesty within the contemplation of the parties to the bond. It was the purpose of the bond to indemnify the bank against the fraudulent and deceitful dishonesty of Sprague, and not against loss arising from transactions of which the bank not only had knowledge, but to which it consented. In making these loans and overdrafts no fraud or deceit was practiced by Sprague. The transactions were open and above board and plainly revealed by the books and records of the bank.

It is claimed that Sprague dominated the affairs of the bank, that the board of directors paid little or no attention to the affairs of the bank, and that, as a matter of fact, the directors had no knowledge of these transactions. It must be held that they had at least constructive knowledge. Sec. 221.08, Stats., provides that "The affairs of the bank shall be managed by a board of not less than five directors, all of whom shall be residents of the state of Wisconsin, and a majority of whom shall be residents of the county or adjoining counties in which such bank shall be located." By sub. (9) of said section it is further provided that "The board of directors shall meet at the bank at least once every three months. At such meeting they shall generally examine into the affairs of such bank and determine whether all items of assets are of the value at which they are carried on the books of the bank." By sec. 221.09 it is provided that "The board of directors of each bank shall annually appoint from its members or stockholders an examining committee, whose duties it shall be to examine the condition of the bank at least once every six months, or oftener, if required," and that said committee "shall report to the board, giving in detail all items included in the assets of the bank which they

have reason to believe are not of the value at which they appear on the books and records of the bank, and giving the value of each of such items as in their judgment they may have determined. The board shall cause said report to be recorded in the minute books of the bank, and a duly authenticated copy thereof transmitted to the commissioner of banking." By sec. 221.15 every bank is required to make a report of its condition to the commissioner of banking at least three times during each calendar year. This report is required to be signed by the officers of the bank and attested by at least two of the directors. ·

The Northern State Bank was not interfered with by the commissioner of banking from 1917 to 1923, and there can be no doubt that these reports were duly made to the commissioner of banking as required by law. These statutes could not have been complied with on the part of the directors of the bank without knowledge of Sprague's indebtedness to the bank. As was said by Mr. Justice KERWIN in *Eland State Bank v. Massachusetts B. & I. Co.* 165 Wis. 493, 498, 162 N. W. 662: "It was their duty to know, and they cannot now, in the face of the record, say they did not know. . . . Public policy as well as private rights require that officers of banks should be held to a strict accountability in the discharge of their official duties." A board of directors is provided by law for the purpose of managing and supervising the affairs of a bank. At least one of the purposes of such supervision and management is to prevent the principal officers from looting the bank. A company becoming surety upon an indemnity bond such as this has a right to assume that a bank will be managed and supervised in the manner provided by law. Such supervision and management affords a measure of protection to the indemnity company upon which it has a right to rely. Furthermore, it has a right to assume that practices followed by the officers of a bank through a long period of time, by and with the knowledge and consent of the bank and its board of directors, will not and cannot

be characterized as fraudulent or dishonest acts within the meaning of its bond of indemnity. We must hold that the indebtedness of Sprague to the bank was not of a character imposing liability upon the surety company under its indemnity bond.

. *By the Court.*—Judgment reversed, and cause remanded with instructions to dismiss the complaint.