Cleveland **TOWNSLEY**, Appellant–Respondent,

v.

**MARION COUNTY DEPARTMENT OF CHILD SERVICES,**
Appellee–Petitioner

**and**

**Child Advocates, Inc., Appellee (Guardian ad Litem).**

No. 49A02–0508–JV–802.

Court of Appeals of Indiana.

June 6, 2006.

Patricia Caress McMath, Indianapolis, IN, Attorney for Appellant.

Elizabeth G. Filipow, Indianapolis, IN, Attorney for Appellee Marion County Department of Child Services.

## OPINION

SULLIVAN, Judge.

Appellant, Cleveland Townsley[1] ("Father"), challenges the juvenile court's order determining his child, C.T., to be a child in need of services ("CHINS"). Upon appeal, Father challenges the CHINS adjudication by claiming that the admission of child hearsay evidence during the hearing did not comport with the requirements of Indiana Code § 31–34–13–3 (Burns Code Ed. Repl.2003), and that in light of this inadmissible evidence, there was insufficient evidence to support the CHINS adjudication.[2]

We reverse and remand.

C.T. was born on October 7, 1996 and was eight years old at the time of the events leading to the CHINS petition.[3] According to Tashawna Sowell, who was Father's ex-girlfriend,[4] C.T. called her on January 26, 2005 after she moved out of Father's house and told her Father had been touching him inappropriately. Sowell testified to the following at the June 30, 2005 fact-finding hearing:

> "He in his own words, he said, Mom, I'm tired and I'm ready to tell the truth. And I said tell the truth about what? And he said um he started to cry a little bit, and I was like, now you got to be strong, tell me what? What are you talking about? And he said every time I go to sleep my daddy be playing with me. And I started crying and I said [C.T.] I know you not lying. Don't lie to me about this cause just don't be telling me something thinking that you can come with me because I'm not your legal parent. You know you cannot come with me. And he said Mama I promise I'm not lying. And I just told him to go

---

1. There is some discrepancy as to whether Father's surname is "Townsley" or "Townsend." Father stated at the hearing that his birth certificate says "Townsend," but that his driver's license and social security card say "Townsley." Tr. at 96. Father claims his surname is Townsley, and the court ordered that his name be amended to "Townsley" in the fact-finding order. We therefore refer to him as Townsley.

2. C.T.'s birth mother is not an active party to this appeal. See Ind. Appellate Rule 17A. She testified in the CHINS hearing that she currently attends meetings to treat her drug abuse problems, and that her parental rights to three of her other children have been terminated.

3. Both the CHINS petition and the factual stipulation state C.T. was born on October 7, 1986, and that he was eight years old at the time of the petition. We presume C.T. was born on October 7, 1996.

4. Sowell, who is not C.T.'s mother, and who was approximately twenty years old when she moved out of Father's house, testified she served as step-mother to C.T. during the two years she lived with Father, who is approximately sixty years old.

to school and have a nice day and I'll talk more about it when he get out of school. And once he got out of school that half a day he told me that he didn't want to go back over there no more. Can I call ... his midtown lady that he was going to go see for his treatment or whatever and I told him that um I asked him where was he at and he said he was over to his grandmother's house and I said I'm on my way over there to come get you. And he said Mom well come on cause you know my daddy don't want, if my daddy find out you talking to me my daddy gonna whoop me." Tr. at 49–50. Sowell further testified that "some nights" in the past, when she was staying with Father, C.T. would become jittery about her leaving him there. She further testified that when C.T. was four years old and went to stay with his biological mother, C.T. told her about Father's "messing" with him but that his mother had not believed him, and that C.T. had begged not to be sent back to Father's house out of fear that Father would "beat" him. Tr. at 51.

Sowell called Y'Nesha Johnson, who worked as an out-patient therapist with Midtown Community Mental Health Center and who had been seeing C.T. for his ADHD diagnosis. Johnson testified that she interviewed C.T. after Sowell brought him in and that during the interview C.T. spoke to her about being molested. According to Johnson, she first spoke with Sowell about C.T.'s claims, and then she proceeded to ask C.T. what Johnson admitted were probably leading questions about his claims. Johnson testified that

C.T. had told her that Father had touched and penetrated his "behind." Tr. at 64. C.T. further reportedly stated that Father had touched him underneath his clothes. Johnson indicated that C.T.'s answers appeared somewhat contrived and that she could not tell if C.T.'s answers were reliable. Johnson further testified that C.T. expressed fear at the prospect of returning home because of Father's sexual abuse.

According to Dale Reynolds, an investigator with Child Protective Services ("CPS") of the Indiana Department of Child Services ("DCS"),[5] he was assigned to investigate the case involving C.T. on January 26, 2005. Reynolds testified that there had been a report to his agency that C.T. had stated he was being made to sleep with Father and that Father had touched his private parts. Reynolds understood that the alleged touching did not include penetration, so he did not seek medical attention for him. In investigating the report Reynolds testified that he went to Children's Bureau where the child was, talked to a therapist and to Sowell and received authorization to remove C.T. Reynolds ultimately took C.T. to Lynette Garcia for an interview.

■ Lynette Garcia, a forensic child interviewer with the Child Advocacy Center, testified that she also interviewed C.T. Garcia testified that she used open-ended questions rather than leading questions in the interview. After indicating that she believed C.T.'s statements were reliable,[6] Garcia related that C.T. had told her that Father touched the "outside of his butt

---

5. The Marion County Office of Family and Children, which filed the CHINS petition in this case, is now known as the Indiana Department of Child Services.

6. Father makes no argument on appeal challenging Garcia's conclusion that C.T.'s statements to her were reliable. We note, however-

er, that witnesses are prohibited from making direct assertions as to their belief in a child's allegations. See *Stewart v. State*, 555 N.E.2d 121, 125 (Ind.1990), *abrogated on other grounds by Lannan v. State*, 600 N.E.2d 1334 (Ind.1992).

with his wee-wee" on more than one occasion, beginning in December of 2004, with the last incident occurring on January 26 of 2005. Tr. at 73. C.T. did not indicate to Garcia that the touching included penetration. Garcia understood that, according to C.T., both he and his father were wearing "drawers and robes" at the time, and that the touching happened on the outside of C.T.'s clothes while C.T. was asleep. Tr. at 73. Garcia further testified that C.T. had told her he wished to live with Sowell.

Father testified that C.T. had lived with him the past eight years, and in that time he had never sexually molested C.T. in any way. Father claimed that Sowell had been living with him, but that he had made her leave because she was "snortin' and smoking that stuff." Tr. at 88. According to Father, Sowell responded to Father's kicking her out with the allegations now at issue. Father also offered into evidence a valentine C.T. had given him during a supervised visit following C.T.'s removal in which C.T. expressed his love for Father and his wish to return home.

At the start of the June 30 fact-finding hearing in which the above testimony was heard, Father objected to the introduction of child hearsay evidence. In response to Father's preliminary objection, the court stated, "[Y]our second issue is premature because they haven't offered anything yet. [W]e'll entertain that objection if and when such evidence is presented." Tr. at 23. DCS then introduced into evidence as a business record, over objection by Father, an affidavit signed by Clinical Psychologist Dr. Marla Smith stating that there was a substantial likelihood of emotional or mental harm to C.T. if he were to testify in the CHINS proceeding. Throughout the hearing Father objected to the introduction of evidence regarding C.T.'s allegations as testified to by Reynolds, Sowell, Johnson, and Garcia. The court overruled Father's objections to C.T.'s hearsay evidence.[7] Following the hearing, the court found that the DCS had met its burden of proof with respect to both Father and Mother that C.T. was in need of services. The court continued C.T.'s placement in foster care and gave Father supervised visitation with C.T.

Upon appeal, Father argues that the trial court erred by admitting the child hearsay evidence without holding a separate hearing or making specific findings of reliability as required by Indiana Code § 31–34–13–3, and by admitting State's Exhibit 1 as a business record and concluding that C.T. was unavailable as a witness. Father further argues that, because the evidence used to support the CHINS adjudication was inadmissible hearsay, there was insufficient evidence to support C.T.'s CHINS adjudication.

Indiana Code § 31–34–13–3, which provides for the admissibility of certain child hearsay statements in CHINS proceedings, states the following in pertinent part:

"A statement or videotape . . . is admissible in evidence in an action to determine whether a child . . . is a child in need of services if, after notice to the parties of a hearing and of their right to be present:

(1) the court finds that the time, content, and circumstances of the statement or videotape and any

---

7. The court overruled Father's objection to Reynolds's testimony on the basis that it was introduced to show why Reynolds began his investigation and was therefore not hearsay. But see *Swain v. State,* 647 N.E.2d 23 (Ind.Ct. App.1995), *trans. denied; Mayes v. State,* 162 Ind.App. 186, 318 N.E.2d 811 (1974), *trans denied, disapproved of on other grounds by Fletcher v. State,* 264 Ind. 132, 340 N.E.2d 771 (1976).

other evidence provide sufficient indications of reliability; and

(2) the child:

. . .

    (C) is found by the court to be unavailable as a witness because:

    (i) a psychiatrist, physician, or psychologist has certified that the child's participation in the proceeding creates a substantial likelihood of emotional or mental harm to the child. . . ."

    ■   In determining the meaning of this statute we note that " '[a] question of statutory interpretation is a matter of law to be determined by this court. We are not bound by a trial court's legal interpretation of a statute and need not give it deference. We independently determine the statute's meaning and apply it to the facts before us.' " In re *J.Q.*, 836 N.E.2d 961, 964–65 (Ind.Ct.App.2005) (quoting *Perry–Worth Concerned Citizens v. Bd. of Comm'rs of Boone County.*, 723 N.E.2d 457, 459 (Ind.Ct.App.2000), *trans. denied*).

In previously interpreting I.C. § 31–34–13–3 in the context at issue, we considered that an important purpose of the Indiana Juvenile Code was to provide a judicial procedure that "ensures fair hearings" and "recognizes and enforces the legal rights of children and their parents." *J.Q.*, 836 N.E.2d at 965; Ind.Code § 31–10–2–1 (Burns Code Ed. Repl.2003). We concluded in *J.Q.* that "a logical and fair reading of I.C. § 31–34–13–3 requires some separation of the child hearsay determination and the CHINS determination in order to give effect to the statute's notice and hearing requirements." 836 N.E.2d at 965. We therefore held that it was error for the trial court to merge its decisions regarding the admissibility of the child's statements and the CHINS determination into one fact-finding hearing. Id.

    ■   In the present case, the DCS petitioned the court for a hearing to introduce C.T.'s out-of-court statements pursuant to I.C. § 31–34–13–2 (Burns Code Ed. Repl. 2003) on February 2, 2005. No separate hearing was held. At the June 30, 2005 fact-finding hearing, following Father's preliminary objection to the admission of the child hearsay statements, the court stated Father's objection was premature and ruled that it would "entertain that objection if and when such evidence is presented." Tr. at 23. C.T.'s statements alleging Father's sexual abuse were subsequently admitted during the hearing. With respect to Sowell's testimony regarding C.T.'s allegations, the court found that the "time, content and circumstance of the two statements in question do have the sufficient additional reliability under the protected person statute."[8] Tr. at 57. With respect to Johnson's testimony, the court again stated, "I'm going to overrule the objection as to . . . child hearsay pursuant to the protected persons statute." Tr. at 68. With respect to Garcia's testimony, the court similarly stated, "[F]ind the young [C.T.'s] statements to be at the time, content, circumstances reliable as to protected person statute." Tr. at 86. All of these rulings, which were taken under advisement when Father made his objections, were made after the testimony had been heard.

Not only were the admissibility and CHINS determinations made in the same actual proceeding, which under *J.Q.* is im-

---

**8.** Although the court referenced the "protected persons statute," which is Indiana Code § 35–37–4–6 (Burns Code Ed. Supp.2005) and applies to criminal proceedings, the court nevertheless cited the correct standard for determining reliability in this civil CHINS proceeding under I.C. § 31–34–13–3, specifically that the time, content, and circumstances of the statements indicate their reliability.

permissible, there was further no meaningful separation of these two distinct matters during that proceeding. The disputed testimony was introduced before the court had made a determination as to its reliability, and once the testimony was heard, the court appeared to lose focus on the question of its admissibility. Indeed, with respect to both Johnson's and Garcia's testimony, the attorneys had to stop the court from continuing forward with the CHINS proceeding in order to remind it to rule on the admissibility of the testimony. We therefore conclude, as we did in *J.Q.*, that the court erred in failing to consider, in a separate hearing, the admissibility of C.T.'s out-of-court statements, and that this was a violation of the requirements of I.C. § 31–34–13–3.

Further, upon a review of the record, we question whether C.T.'s statements were adequately reliable under I.C. § 31–34–13–3 to justify their admissibility. Under I.C. § 31–34–13–3, in order for child hearsay statements to be deemed admissible, the court must find that the time, content, and circumstances of the statements provide sufficient indications of reliability. In *J.Q.*, we indicated that such a finding of reliability is imperative in cases where, if the child hearsay statements are admitted, they will weigh heavily in the court's determination of whether a child qualifies as a CHINS. 836 N.E.2d at 965. In light of the fact that in the case at hand, the sole basis for the CHINS petition with respect to Father was C.T.'s claim that Father had sexually molested him, such findings of reliability were similarly imperative here. In this case, although the court found C.T.'s statements were reliable, it made only broad references to their time, con-

tent, and circumstances. A close review of the record indicates that the reliability of C.T.'s statements as testified to by Johnson and Garcia is somewhat questionable. Johnson, who admitted that she asked C.T. leading questions and could not determine the reliability of his claims, testified that C.T. had told her that Father had touched him underneath his clothes, and that the sexual contact included penetration. In contrast, Garcia testified that C.T. had told her Father had touched him over his clothes, and that C.T. had made no reference to penetration. Garcia further testified that the alleged touching occurred while C.T. was asleep and while both he and Father were wearing "drawers and robes." Tr. at 73. In light of the arguable inconsistency in C.T.'s alleged statements and the fact that C.T.'s claims to Johnson were seemingly contrived answers to her leading questions, we question the court's broad determination of their reliability.

■ The court's failure, in this CHINS adjudication, to comply with the requirements of I.C. § 31–34–13–3 to hold a separate hearing to determine the admissibility of child hearsay statements and its broad determination of the statements' reliability in spite of the arguable inconsistencies in C.T.'s statements at issue undermine our confidence in its determination that C.T. is a CHINS.[9] Accordingly, we reverse the CHINS adjudication and remand to the trial court with instructions to re-evaluate the CHINS petition consistent with the requirements of I.C. § 31–34–13–3. See *J.Q.*, 836 N.E.2d at 967. C.T.'s placement shall remain in therapeutic foster care pending the court's CHINS determination.

---

**9.** Given our holding, we deem it unnecessary to address Father's claim that the court erred in admitting as a business record Dr. Smith's affidavit introduced to show C.T.'s unavaila-

bility. We further find it unnecessary to address Father's challenge to the sufficiency of the evidence.

The judgment of the trial court is reversed, and the cause is remanded with instructions.

KIRSCH, C.J., and DARDEN, J., concur.